UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

PATRICIA PAMONICUTT (STEVENS),

        Plaintiff,

  v.                                       Case No. 15-C-457

CAROLYN W. COLVIN,
Acting Commissioner for Social Security,

        Defendant.

---

**DECISION AND ORDER**

---

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Patricia Pamonicutt's applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act. For the reasons set forth below, the Commissioner's decision will be affirmed.

**I. BACKGROUND**

Plaintiff filed an application for DIB on May 21, 2009, alleging an onset date of March 21, 2007. She filed an application for SSI on September 25, 2009. Plaintiff claimed she was unable to work because of degenerative bone disease, arthritis, and chronic obstructive pulmonary disease. She was also obese during the relevant time, with a Body Mass Index of 33 or 34 based on her height of 5 feet 3 inches and weight between 184 to 200 pounds.

Plaintiff's claim rested primarily upon her complaint of chronic low back pain. The record reflects that Plaintiff was diagnosed with anterior spondylolisthesis with disc herniation at L5-S1. In August 2010, fusion surgery was performed. Despite this surgical intervention, Plaintiff testified

at a hearing before an Administrative Law Judge on August 30, 2013, that she was unable to walk more than a block before needing a break, or stand for more than ten to fifteen minutes before having to sit down because of pain. She testified that she was unable to kneel, crouch or crawl, that she could not climb or walk down or walk up stairs without pain in her knees and back, and that she could not sleep through the night. Plaintiff testified that she would sleep four hours a night and was awakened by jabbing pains throughout her body. As a result she needed to nap two hours per day. Plaintiff also testified that she had difficulty holding or grabbing things with her hands. Because of her pain and disability, Plaintiff testified that she spent most of the day in her recliner. R. 137–39.

The ALJ found Plaintiff "not entirely credible" and issued a written decision denying her claim on November 5, 2013. The ALJ found Plaintiff had severe impairments of back disorder, status-post fusion of the L5-S1 vertebra; diabetes mellitus; obesity; and status-post carpal tunnel syndrome release surgeries. R. 13. Notwithstanding these impairments, however, the ALJ found Plaintiff had the residual functional capacity (RFC) to perform "light" work as defined in 20 C.F.R. § 404.1567(b) with only occasional balancing, stooping, crouching, kneeling, crawling and climbing of ramps, stairs, ladders, ropes and scaffolds, with only frequent (not constant) handling and fingering with her bilateral upper extremities, with no exposure to extreme heat, wetness or humidity, excessive vibration, or pulmonary irritants such as fumes, odors, dust and gases, and, finally, with no exposure to unprotected heights or hazards and no use of moving machinery. R. 17.

With this RFC, the ALJ found Plaintiff could perform her past relevant work as a cashier checker. R. 23. Alternatively the ALJ found that Plaintiff could perform other jobs such as

2

industrial inspector, housekeeper/cleaner, cashier, office helper, order clerk, information clerk, and inspector. R. 24–25. Thus the ALJ found Plaintiff not disabled under the Social Security Act at step four and alternatively at step five of the Administration's sequential evaluation process. *See* 20 C.F.R. § 404.1520(a).

The Appeals Council denied review February 13, 2015 thereby making the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed this action for judicial review under 42 U.S.C. § 405(g). She contends that the ALJ erred in his assessment of her credibility and in failing to consider her obesity in assessing her RFC.

**II. ANALYSIS**

    **A. Legal Standard**

On judicial review, a court will uphold the Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind could accept as adequate to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Although a decision denying benefits need not discuss every piece of evidence, remand is appropriate when an ALJ fails to provide adequate support for the conclusions drawn. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). The ALJ must provide a "logical bridge" between the evidence and conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ is also expected to follow the Agency's own rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). In reviewing the entire record, the court does not

3

substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

**B. Credibility**

Plaintiff argues that the ALJ failed to give adequate consideration to her subjective reports of pain and that his credibility determination is therefore contrary to law. She contends that the ALJ misstated the record and "cherry-picked" evidence that supported his findings, while ignoring evidence that did not. She also contends that in light of the clear medical evidence of her back pain, culminating in the surgery she underwent in August 2010, the ALJ's rejection of her complaints because of a lack of supporting objective evidence is contrary to law. Pl.'s Reply at 2 (ECF No. 21).

It is clear from a review of the ALJ's decision, however, that he complied with Social Security Ruling (SSR) 96-7p in assessing Plaintiff's credibility. SSR 96-7p sets out a two-step process the ALJ is to follow in assessing a claimant's statements describing her symptoms. The ALJ must first determine whether the claimant has any medically determinable physical or mental impairment or impairments that could reasonably be expected to produce the pain or other symptoms claimed. If so, the ALJ must then evaluate the intensity, persistence or functionally limiting effects of the pain or other symptoms to determine the extent to which they limit the claimant's functioning. Whenever the claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by the objective medical evidence, the ALJ must then make a finding on the credibility of the claimant's statements

4

based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186 at *2. Among the factors the ALJ should consider in assessing the credibility of the claimant's testimony or statements, the Ruling lists the following: activities of daily living; the location, duration, frequency, and intensity of the pain; factors that precipitate and aggravate the pain; the type, dosage, effectiveness, and side effects of medication taken to alleviate pain; treatment other than medication for relief of pain; measures other than treatment taken to relieve pain; and any other factors concerning the individual's functional limitations and restrictions due to pain. *Id.* at *3.

On review of the Commissioner's decision, a court may overturn an ALJ's credibility determination only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2011). This follows from the obvious fact that "an ALJ is in the best position to determine the credibility of witnesses . . . ." *Id.* However, an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). A failure to do so could also be grounds for reversal. *See Bjornson v. Astrue*, 671 F.3d 640, 649 (7th Cir. 2012).

Here, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. R. 18. In other words, the ALJ found that the underlying back problems shown in Plaintiff's MRIs could reasonably be expected to produce back pain. But the MRIs and other medical evidence alone—showing mild problems gradually worsening until surgery was performed—did not establish that Plaintiff had the disabling pain she claims. Nor does the medical evidence of Plaintiff's post-operative condition. Thus, the ALJ was required to determine the credibility of Plaintiff's claims of disabling pain.

In a thorough decision, the ALJ found Plaintiff's statements of debilitating pain "not entirely credible" for a number of reasons. First, the ALJ noted "in the months immediately following her alleged onset date, the claimant had very minimal medical care for her back." R. 18. As the ALJ explained, in late 2007 Plaintiff was reportedly doing "strikingly well without her hydrocodone." R. 19 (citing R. 503). In fact, only a month earlier, Plaintiff injured her left shoulder and left clavicle while helping a friend move. R. 504. She again reported sustaining an injury, this time to her back, while helping her sister move something up a flight of stairs in June 2008. R. 494. She "continued to function well through most of 2008 and required minimal medical care" and even when she sought care in late 2008, it was noted that her back was "not particularly striking." R. 19 (citing R. 483).

The ALJ observed that although Plaintiff had an exacerbation in early 2009, Dr. James Lacey of the Oneida Community Health Clinic noted diagnostic testing "looks strikingly normal" and he did not see evidence of nerve compression or radiculopathy. R. 19 (citing R. 480, 481). In October 2009, Dr. Lacey remarked that the MRI "did not show much" and encouraged her to follow through with a specialist. R. 19 (citing R. 476). In 2010, it was noted that Plaintiff presented at the Menominee Clinic with a walker and complaining of debilitating pain, but the ALJ noted that the examining doctor observed she "seems to be in mild pain." Like Dr. Lacey, the ALJ noted that Dr. Benjamin Crenshaw, who saw Plaintiff at the Menominee Clinic, observed the MRI findings were "overall pretty unremarkable." R. 19 (citing R. 627).

Of course, the ALJ recognized that the MRI findings showed some worsening of Plaintiff's back and he noted that she ultimately elected to undergo the lumbar fusion and decompression in August 2010. R. 20. But he also noted the post-op notes show improvement up until the 6-month

6

post-op visit. *Id.* After that, the ALJ found "claimant apparently healed well from her surgery as she essentially required no more medical care for her back [until] March 2012." *Id.* At that time although she reported some residual pain and not feeling 100 percent better she was also dismissed from the pain clinic due to missed appointments. *Id.* The ALJ summarized:

> Considering this evidence, at the time that the claimant filed her application for disability benefits, despite having some back pain, she was active, functioning well, trying to work, dealing with multiple incarcerations, visiting a doctor infrequently and managing her pain 'strikingly well' without hydrocodone. Even when the claimant experienced exacerbations of her back pain in 2008 through 2009, her doctor stated that her diagnostic testing 'look[ed] strikingly normal,' and he did not see any evidence of nerve compression or radiculopathy. The claimant ultimately underwent an August 2010 lumbar spine fusion with good results; she has required almost no medical care for her back condition after her healing period ended. Consequently, the evidence does not document such severe physical limitations, as one would expect given her allegations of a continued, complete inability to work since the alleged onset date.

R. 20 (citations omitted).

The ALJ commented that Plaintiff's activities of daily living, including attempting to work several jobs, working on vocational rehabilitation, taking business management classes, and helping relatives move ("by, at least, carrying a dresser and going up stairs"), were inconsistent with her allegations of a disabling condition. R. 22. He noted "the claimant's veracity concerning her subjective pain level is further impaired by allegations of drug-seeking behavior" and that "Dr. Lacey ultimately resolved not to prescribe the claimant any hydrocodone, noting that she came to an appointment in tears saying the only thing that works for her pain was hydrocodone. Dr. Lacey responded that, 'We have had this conversation several times before. She goes to the ER for [hydrocodone]. There have been questions as to what she has done with [hydrocodone]. Told her, I would not give her [hydrocodone]." R. 22 (citing R. 747). Finally, he noted "the record shows

7

that the claimant has filed multiple applications for disability benefits, which arguably does not bolster her credibility as much as someone with a strong work record who suddenly stops working due to a change in their medical condition." R. 23.

Plaintiff argues the ALJ erred in inferring from the fact that she was dismissed from the pain clinic due to missed appointments that she had "apparently healed well from her surgery." R. 20. Plaintiff notes she had two family deaths around that time and the ALJ should have asked her about her dismissal from the pain clinic before using that fact against her. Pl.'s Br. 16. But the broader point, as the ALJ noted, is that she "required almost no medical care for her back condition after her healing period ended." R. 20. And the ALJ did ask Plaintiff about this at her hearing. R. 130–31. Plaintiff responded at the hearing that her last treatment for her back was two years earlier, which would have been August 2011. R. 130. Therefore, even assuming Plaintiff missed multiple pain management appointments for family reasons and not simply because she was in less pain at the time, that still does not undermine the ALJ's reasonable inference that she was not as limited as she claimed since a person who had the pain and disability she claimed would be unlikely to forego seeking treatment for a period of over two years (August 2011 to the hearing), as Plaintiff essentially admitted she had done. It is clear from the lengthy medical record that Plaintiff was not shy about seeking medical care when she felt she needed it and had no difficulty obtaining it.

Further, "a claimant represented by counsel is presumed to have made [her] best case before the ALJ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). Given that Plaintiff was represented by counsel at the hearing and given that the ALJ specifically asked Plaintiff about her post-surgery back treatment, the ALJ cannot now be faulted for inferring from a lack of back treatment—during a time when Plaintiff continued to seek treatment for many other issues like neck

8

pain, psoriasis, problems swallowing, and carpal tunnel—that Plaintiff had "apparently healed well from her surgery."

Plaintiff also argues the ALJ improperly focused on her alleged drug-seeking behavior. In support of her argument, she cites *Moore v. Colvin*, where the ALJ relied on evidence suggesting the claimant's ER visits to obtain medication were related to an addiction rather than mere migraine control, but ignored other evidence suggesting there was no addiction. 743 F.3d 1118, 1122–24 (7th Cir. 2014). Plaintiff argues the ALJ here likewise noted the allegations of drug-seeking behavior but ignored the fact that Plaintiff later did undergo surgery and did receive narcotics prescriptions from other doctors. Pl.'s Br. 17.

Plaintiff is taking the ALJ's statements out of context. A fair reading of the ALJ's decision reveals that he did not ignore the fact that Plaintiff had real pain that ultimately required surgery. Indeed, the ALJ's ultimate conclusion that Plaintiff was not disabled rested on his conclusion that the fusion surgery she had in August 2010 essentially resolved her chronic low back pain to the extent that it no longer required regular follow-up care with her doctors. The drug seeking behavior to which the ALJ referred appears much earlier in the medical record before surgical intervention was indicated. Moreover, the ALJ mentioned it not to suggest that Plaintiff did not experience low back pain, but as a further reason for questioning the credibility of her statements that she continued to suffer debilitating pain even after the surgery. More than one of Plaintiff's doctors expressed concern over whether her pain was as severe as she claimed or whether she simply wanted Vicodin.

For example, as the ALJ noted, Dr. Lacey at the Oneida Community Health Clinic stated she had been kicked out of the pain clinic prior to the alleged onset date of her disability for getting hydrocodone (Vicodin) from multiple sources. R. 22, 478. Dr. Lacey raised similar questions

9

himself. He noted in one report that Plaintiff presented on May 27, 2009, in tears, wearing a brace and using both a cane and a wheelchair. She claimed that nothing but Vicodin, which she later described as her "drug of choice," worked for her. R. 478, 494. Yet, on examination, Dr. Lacey noted that "she did not flinch on one side or the other when she got out of the chair." He noted she could walk around and he could not tell any difference in her pain. Dr. Lacey stated he could not elicit pain in her lower back, and though she resisted bending or moving, he thought it was resistance on her part as opposed to inability to bend or move. R. 478. In the same report, Dr. Lacey noted that Plaintiff had gone to the emergency room and was "most frustrated because she was given a Medrol Dosepak and cyclobenzaprine when it was clear that she wanted Vicodin." *Id.* Dr. Lacey planned to have Plaintiff seen in the Prevea Spine Clinic for a second opinion because he was not convinced she was there to see him for therapy. He also expressed uncertainty whether Plaintiff would receive another hydrocodone prescription for him. *Id.* Dr. Crenshaw at the Menominee Tribal Clinic expressed similar concerns in February 2010. R. 627.

It is, of course, true that frequent use of narcotic pain medication can be evidence of frequent and severe pain. At the same time, exaggerating the extent of one's pain to obtain narcotic pain medication and seeking it from multiple sources can also be evidence of a strong desire for the narcotics themselves and even addiction. In addition, less than honest efforts to obtain such medications certainly bear on the credibility of the claimant. *See Poppa v. Astrue*, 569 F.3d 1167, 1172 (10th Cir. 2009) ("Contrary to Ms. Poppa's assertion that the only evidence of drug-seeking behavior is a 'single, isolated remark in the record,' . . . there is sufficient evidence in the record to support the ALJ's determination that Ms. Poppa's credibility about her pain and limitations was compromised by her drug-seeking behavior."); *see also Anderson v. Shalala*, 51 F.3d 777, 780 (8th

10

Cir. 1995) (observing that claimant's "drug-seeking behavior further discredits her allegations of disabling pain"); *Simila v. Astrue*, 573 F.3d 503, 520 (7th Cir. 2009). The ALJ did not error in his consideration of such evidence here.

Next Plaintiff argues the ALJ erroneously discounted her reports of pain "because of the lack of objective supporting evidence." Pl.'s Br. 18. The argument is difficult to understand. Plaintiff correctly notes that pain can be disabling even though no physical cause can be identified, *Pierce v. Colvin*, 739 F.3d 1046, 1049–50 (7th Cir. 2014), but this principle is irrelevant here given that the physical cause of Plaintiff's back pain was obvious, undeniable, and objectively verifiable through the MRI findings. The ALJ simply did not believe the record as a whole was consistent with her statements regarding the intensity, persistence and limiting effects of her pain. In other words, he found her "not entirely credible" in her statements about the frequency and extent of pain she experienced.

In the end, Plaintiff's credibility argument seems based on a flawed reading the SSA's two-step method for evaluating symptoms. Plaintiff argues that under the *second* step, "[t]he claimant is only required to show that his or her impairment could reasonably have caused some degree of symptom." Pl.'s Br. 18. That is the question at step one, however, not at step two. Step two requires the ALJ evaluate the intensity, persistence and limiting effects of symptoms, and where the claimant's statements about these things are not substantiated by objective medical evidence alone, the ALJ must make a credibility finding based on the entire case record. SSR 96-7p at *2. "[A]n individual's symptoms, including pain, will be determined to diminish the individual's capacity for basic work activities to the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and

11

other evidence in the case record." *Id.* (interpreting 20 C.F.R. § 404.1529(c)(4)). Here the ALJ concluded for the reasons he set out in his written decision that Plaintiff's claims of debilitating pain could not reasonably be accepted as consistent with the record. Because that conclusion was not patently wrong, it must withstand judicial review.

One final point should be made. Plaintiff accuses the Commissioner of violating the *Chenery* doctrine by citing evidence the ALJ did not cite in his written decision. Reply at 8–9. In *SEC v. Chenery Corp.*, the Supreme Court held that on judicial review of an administrative agency's action, a court may not uphold the challenged decision on grounds that were neither asserted before, nor relied upon by, the agency itself. 318 U.S. 80, 87–88 (1943). Plaintiff, relying on a broad reading of Seventh Circuit's application of *Chenery* in Social Security cases, *see, e.g.*, *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010), argues that the Commissioner has done the same here. The Commissioner has done nothing of the kind. She has merely responded to Plaintiff's argument that the ALJ "cherry-picked" favorable evidence to support his findings and ignored unfavorable evidence. How else can the Commissioner be expected to respond to such an argument than by citing additional evidence in the record that supports the finding made by the ALJ? Plaintiff's attempt to use *Chenery* as a shield to prevent the Commissioner from citing evidence in the record to refute her argument that the ALJ's recounting of the evidence in his decision was one-sided must in fairness be rejected. "Citing evidence not mentioned by the ALJ to support findings the ALJ actually made is not the same as defending the ALJ's decision on grounds the ALJ did not offer or on which he or she did not rely." *Senn v. Astrue*, 2013 WL 639257, *8 (E.D. Wis. Feb. 21, 2013) (unpublished). The Commissioner's argument was entirely proper.

12

**C. Obesity**

As noted, the ALJ found Plaintiff had severe impairments related to her back and her obesity. He also found she alleged a knee impairment, but the ALJ found it non-severe based on very minimal treatment records (two appointments in 2012), insignificant findings at those appointments, and the lack of any allegation by Plaintiff at the hearing that her knees caused her work-related limitations. R. 15. Plaintiff does not argue the non-severe finding regarding her knees was wrong per se. But she likens her case to *Martinez v. Astrue* because in that case and this case the ALJs did not explicitly discuss obesity and alleged knee problems together. 630 F.3d 693, 698–99 (7th Cir. 2011).

The entirety of the Seventh Circuit's discussion of obesity in the *Martinez* decision is as follows: "The gravest error in an opinion with a number of contenders for that distinction is the failure to consider the bearing of Rider's extreme obesity. The administrative law judge mentioned in passing that it is a severe impairment but did not consider its significance in relation to Rider's knee. It is one thing to have a bad knee; it is another thing to have a bad knee supporting a body mass index in excess of 40. We repeat our earlier reminder that an applicant's disabilities must be considered in the aggregate." *Id.* Here, however, the ALJ did not mention severe obesity in passing and otherwise ignore it. Instead, he addressed it at steps two, three, and four. R. 13 (obesity a "severe" impairment), 16–17 (obesity "alone or in combination" with other impairments did not meet a listing), 21–22 (noting obesity may make alleged back pain worse than would be expected without obesity). This was consistent with the applicable ruling, which says ALJs must consider obesity at steps two, three and four, and must consider in relation to RFC that the "combined effects

13

of obesity with other impairments may be greater than might be expected without obesity." "Titles II and XVI: Evaluation of Obesity," Social Security Ruling 02-1p, 2002 WL 34686281 at *3, 6.

In short, I do not read *Martinez* as necessarily requiring obesity and knees are always addressed together. Where an ALJ notes obesity at each step in the evaluation process, one can reasonably infer the ALJ remembered the obesity when addressing the claimed knee issue. Here, the ALJ noted obesity at each step and provided valid reasons for finding the knee issues non-severe. Under these circumstances, a remand to allow the ALJ to articulate his rationale with respect to Plaintiff's obesity is not required.

## III. CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed and the Clerk of Court is directed to enter judgment accordingly.

Dated this   14th   day of March, 2016.

s/ William C. Griesbach<br>
William C. Griesbach, Chief Judge<br>
United States District Court